Cite as 2024 Ark. App. 376

# ARKANSAS COURT OF APPEALS
## DIVISIONS II, III & IV
### No. CV-23-327

| | |
|---|---|
| STEPHANIE WILSON AND WILLIAM A. BUCKLEY III<br><br>APPELLANTS<br><br>V.<br><br><br>JEANETTE KOLTERMAN, BY HER NEXT FRIEND, TAD KOLTERMAN; TAD KOLTERMAN; MONICA JOHNSON; AND JUANITA GROOMER<br><br>APPELLEES | **Opinion Delivered** June 5, 2024<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FCV-21-778]<br><br>HONORABLE R. GUNNER DELAY, JUDGE<br><br>AFFIRMED IN PART; REVERSED IN PART |

## ROBERT J. GLADWIN, Judge

This is an appeal of an amended order of the Sebastian County Circuit Court entered as a result of appellant Stephanie Wilson's ("Wilson's") motion for a new trial, motion to vacate, and motion to modify order. Appellant William A. Buckley III ("Buckley"), Wilson's attorney, appeals the circuit court's order finding him in contempt of court. Appellants argue that (1) the circuit court erred in finding that Wilson's life estate in the property in question was revocable and that the living trust created by appellee Jeanette Kolterman ("Jeanette") could be terminated, and (2) the circuit court's finding of contempt against appellant Buckley should be reversed because there was no valid civil or criminal contempt demonstrated by the record. We affirm in part and reverse in part.

## I. *Background Facts*

Wilson and Jeanette lived together for thirty-eight years from 1983 through 2021. In 1983, Jeanette and her three children moved in with Wilson and lived in her home. Jeanette's children are appellees Tad Kolterman, Monica Johnson, and Juanita Groomer (individually referred to sometimes herein as "Tad," "Monica," and "Juanita," and collectively referred to herein as "appellees"). In 2003, Wilson and Jeanette bought a home—located at 7719 Camelot Circle in Fort Smith, Arkansas (hereinafter "the Residence")—as joint purchasers. Wilson and Jeanette lived together at the Residence from 2003 through 2021. In January 2020, Jeanette sold her family's farm in Iowa and used the proceeds to pay off the mortgage on the Residence. Thereafter, Jeanette and Wilson met with an accountant, Nancy McMillian, and also consulted with attorney Kathryn Stocks in Fort Smith to discuss preparation of trust documents.

On January 2, 2020, Jeanette—as settlor of the Jeanette M. Kolterman Living Trust—established a trust and named Wilson as the trustee. Pertinent portions of the trust state as follows:

> 3.1 **Distributions During Lifetime of Settlor.** So long as the Settlor is living, the Trustee shall pay at the written request of the Settlor so much of the principal of such trust estate as Settlor shall request. Any income derived from this trust shall be distributed to the Settlor at least monthly during the lifetime of the Settlor. If at any time the Settlor shall be incapacitated or shall for any other reason be unable to act on Settlor's own behalf, the Successor Trustee may pay to or apply for the benefit of such Settlor such amounts of the income and principal of the trust estate as the Trustee may from time to time deem necessary or advisable for Settlor's use and benefit.

> 3.2 **Division of Trust Estate at Death of Settlor.** On the death of the Settlor, the Trustee shall hold the trust estate, including any additions to the trust by reason of Settlor's death subject to the uses and conditions set out hereafter.

. . . .

(b) **Termination of Trust and Distribution of Assets.** Upon the death of the Settlor, after payment of expenses, taxes, and other charges, the Trustee shall hold the remaining trust assets as follows:

Stephanie L. Wilson is the beneficiary of all of the assets of this Trust as long as she is alive to use the funds in order that she be able to live in the house located at 7719 Camelot Circle, Fort Smith, AR 72901, owned by the Trust as long as she is able to live there and if she goes into a nursing home and is not able to return after (2) years, then the Trustee if, at her discretion, believes Stephanie L. Wilson will never be able to return to living at the home, then the Trustee can deed the house on the following beneficiaries. Monica Johnson, Juanita Groomer, and Tad Kolterman, in equal shares, per stripes. The provision of the life estate to Stephanie L. Wilson in the house located at 7719 Camelot Circle, Fort Smith, AR, 72903, is irrevocable because she voluntarily gifted her joint [interest] in trust to this Trust (subject to her going to a nursing home as provided herein).

The primary purpose of this Trust is to maintain the house located at 7719 Camelot Circle, Fort Smith, AR, 72903, as long as both the Settlor and Stephanie Wilson can possibly live there independently and/or with the assistance of each other or hiring help so that they can stay in their home and provide funds for those expenses.

. . . .

4.16 Notwithstanding any provision herein to the contrary, during Settlor's lifetime, Settlor reserves the right at any time to instruct the Trustee in writing as to which of the assets contained in the trust land shall be held by the Trustee and which are to be sold, and also reverse the right to instruct the Trustee in writing as to the securities in which any or all of the trust fund shall be invested, and the Trustee shall abide and be governed by such written instructions given to it. . . .

. . . .

6.5 Settlor reserves the right at any time or times to amend, alter, or revoke this trust in whole or in part, or any provisions thereof, by an instrument in writing signed by Settlor and delivered to the Trustee during the lifetime of Settlor except Settlor does not retain the authority to revoke the provisions leaving a life estate in the property to Stephanie L. Wilson in real property located at 7719 Camelot Circle, Fort Smith, AR, 72903.

On that same day, a warranty deed was filed in Sebastian County, wherein Wilson and Jeanette each deeded their one-half interest in the Residence to Wilson, in her representative capacity, as trustee of Jeanette's trust. The deed further noted "[t]here is a provision in the Living Trust that allows Stephanie L. Wilson to remain in the house as long as she is able to do so and is irrevocable."

Shortly thereafter, Jeanette began displaying signs of dementia. Wilson provided care for Jeanette until January 2021, at which time Wilson was hospitalized due to COVID-19 virus complications. Monica began overseeing Jeanette's care while Wilson was in the hospital. On January 29, 2021, Jeanette was moved to Virginia Beach to stay with her son, Tad. On April 9, 2021, Monica petitioned the Sebastian County Circuit Court for guardianship of her mother, Jeanette. Wilson filed an objection to the petition, and on April 21, the circuit court denied the motion, and via an ex parte temporary order, held that Jeanette was to be returned to her home in Fort Smith and that Monica was to return money—taken or obtained—except funds that were to be expended on or for the benefit of Jeanette, including her return to Fort Smith. Jeanette never returned to Arkansas. During a recorded conversation between Wilson and Jeanette that was played at trial, Wilson told Jeanette that the court had ordered that she be returned to Arkansas; however, Jeanette stated that she wanted to stay in Virginia.

On October 13, 2021, Wilson, as trustee, deeded a one-half interest in the Residence to herself in an individual capacity. The deed further states that "in return for her 50% interest, Grantee waives the provision in the Living Trust that gives Grantee a life estate that was irrevocable." In response, on October 22, 2021, appellees filed suit against Wilson to

4

remove her as trustee, fiduciary, and power of attorney for Jeanette. The complaint also sought to invalidate the October 13, 2021 deed Wilson executed in favor of herself as to the Residence. Furthermore, the complaint alleged causes of action for self-dealing, breach of trust, and failure to provide an accounting of trust transactions. Appellees alleged that pursuant to the terms of the trust, Wilson "is only a partial life estate beneficiary of said Trust upon the death of the settlor, Jeanette M. Kolterman." Appellees also argued that "the fair market value of one-half (1/2) of the house and real property located at 7719 Camelot Circle, Fort Smith, Arkansas is greater than the value of the commuted value of the partial life estate of the Defendant, Stephanie L. Wilson." On February 3, 2022, Tad petitioned for and was granted a guardianship over his mother by a court located in Virginia Beach, Virginia.

The matter proceeded to trial before the Sebastian Couty Circuit Court on August 31, 2022. At trial, Tad testified that his mother had been living in Virginia Beach with him for approximately a year but that she was currently residing in a care facility. Afterward, the court entered a temporary order removing Wilson as trustee of Jeanette's trust; removing Wilson as a fiduciary and attorney-in-fact under both powers of attorney; appointing Tad as a replacement temporary trustee; voiding the warranty deed Wilson executed in favor of herself; and ordering an accounting of the trust dating back to January 2, 2020. Regarding the issue of whether Wilson possessed a life estate in the Residence, the court instructed the parties to brief the issue and advised that it would rule on the issue thereafter.

On December 12, 2022, the court entered its order rendering the temporary order permanent as to Wilson's removal as trustee, fiduciary, and power of attorney for Jeanette.

Further, the court held that the trust be terminated at the request of Tad—pursuant to Arkansas Code Annotated section 28-73-602(f) (Repl. 2012)—with the approval of a supervising court. It held that Wilson "has a tenancy at will with an unvested contingent defeasible life estate" in the Residence based "upon the fact that Ms. Kolterman or in this case her guardian, has the right to amend or revoke her Living Trust at any time, which means any right that Ms. Wilson may have in said property pursuant to the trust is subject to termination at the will of Mr. Kolterman, or her guardian."

Regarding the warranty deed, the court held that because the deed did not convey any interest in the property to Wilson individually, any right she might have had to occupy the Residence would extinguish upon termination of the trust; thus, she was not entitled to any of the proceeds from the sale of the Residence. The circuit court held that pursuant to Arkansas Code Annotated section 28-73-201(a) (Repl. 2012), which gives the court the right to intervene in the administration of a trust "to the extent its jurisdiction is invoked by an interested person or as provided by law," because Wilson breached her fiduciary duties and was guilty of self-dealing, it was necessary to terminate her right to possess and occupy the Residence. Accordingly, the court ordered Wilson to vacate the Residence by 5:00 p.m. on January 31, 2023, and further held that she was not to remove any "furniture, fixtures, appliances, or attachments without first obtaining court approval to do so." Finally, the court held that Wilson failed to account for the sum of $13,246.85; thus, the court awarded judgment to appellees for that amount.

On December 22, 2022, Wilson filed a motion for new trial, motion to vacate, and motion to modify order. Appellees filed a motion for citation for contempt on January 19,

2023, against Wilson alleging that she removed unclaimed items in the Residence during her move-out process. The court held a hearing on the motion for contempt on January 20, and Buckley alleged that any disregard of the court's order was not willful or purposeful. At the hearing, Wilson acknowledged that she removed items from the Residence after the entry of the court's December 12 order that expressly ordered her not to do so. Furthermore, Buckley expressed that he failed to explain the order well enough to Wilson regarding what constituted a fixture and what could not be removed from the Residence. The circuit court found Wilson's and Buckley's arguments unpersuasive, noting its statement in open court that no furniture or fixtures were to be removed from the property and its reiteration in the written order. As a result, the court found Wilson in contempt and set the matter for sentencing on January 26.

At the January 26 hearing, the court asked for clarification on which items taken from the Residence by Wilson had not been returned, and Buckley responded that the washer and dryer, refrigerator, desk, and a chair had not been returned. Upon questioning by the court, Buckley admitted he had advised Wilson that she could take her bed out of the Residence when she was moving; however, he stated that he offered no advice regarding the other items that were removed. Buckley argued that contempt was not proper since neither he nor Wilson willfully attempted to circumvent the court's orders. Ultimately, the circuit court sentenced Wilson to seven days in the Sebastian County Detention Center to be suspended upon complete compliance with all circuit court orders.

On February 6, the circuit court entered an amended order, which held in pertinent part as follows:

7

2.    A.C.A § 28-73-302(a) provides "A court may intervene in the administration of a trust to the extent its jurisdiction is invoked by an interested person or as provided by law." With that authority in mind, the court finds that Section 5.1 of Jeanette M. Kolterman Living Trust d/t/d January 2, 2020 should be judicially amended to allow for a more efficient administration of the trust.

. . . .

4. The court finds that the Jeanette M. Kolterman Trust is a revocable trust. Its finding is based upon A.C.A. § 28-73-602(a) which provides, "Unless the terms of the trust expressly provide that the trust is irrevocable, the settlor may revoke or amend the trust." There is no provision in the trust that declares it is an irrevocable instrument. The Defendant argues that the trust is a hybrid of sorts that allows for the revocation of the entire instrument except for one sentence of Section 6.5 that states "Settlor does not retain the authority to revoke the provisions leaving a life estate in the property to Stephanie L. Wilson in the real property located at 7719 Camelot Circle, Fort Smith, AR 72903." The court rejects this argument for the following reasons: First, the provision of Section 6.5 recited above does not contain the necessary elements of a trust standing by itself. Without other necessary language it would fail to meet the legal requirements for a trust. Second, other language contained in Section 6.5 makes it clear the instrument was revocable. It states, "Settlor reserves the right at any time or times to revoke this trust in whole or in part, or any provisions thereof . . .". If the settlor intended to make the trust irrevocable she would not have included the provision she could revoke the trust "in whole" which means in its entirety. Third, Section 3.1 of the trust provides, "So long as the Settlor is living, the Trustee shall pay at the written request of the Settlor so much of the principal of such trust estate as Settlor shall request." That section adds, "If at any time the Settlor shall be incapacitated or shall for any other reason be unable to act on Settlor's behalf, the Successor Trustee may pay to or apply for the benefit of such Settlor such amounts of the income and principal of the trust estate as the Trustee may from time to time deem necessary or advisable for Settlor's use and benefit." These provisions give the settlor and trustee the absolute and unlimited right to use the trust assets, including the residence for her benefit during her lifetime. This includes the right to sell the residence and use the proceeds for her maintenance and upkeep. The court would note that the settlor made a payment of $71,313.82 toward the loan on the residence just a few years before she was placed under a guardianship. If the Defendant's position were accepted, the settlor would be precluded from accessing that money through the sale of the residence. If that was her intent, she clearly would not have depleted her assets in such a substantial way without any ability to recoup them. The court finds that it was not her intention to give Ms. Wilson any right in the property that would supersede or extinguish her own right to use the property for her benefit.

8

. . . .

6.  This Court finds that the Warranty Deed filed of record on January 7, 2020, does not grant a life estate to Stephanie L. Wilson. The language of the deed states in part, "There is a provision in the Living Trust that allows Stephanie L. Wilson to remain in the house as long as she is able to do so and is irrevocable." This language does not create a life estate for Ms. Wilson, but merely makes a reference to the trust. However, even if this language created a proprietary interest in favor of Ms. Wilson such interest was limited by the contingency that she could only reside in the residence as long as she is "able to do so." The court finds she is unable to do so because she does not have the financial means necessary to care, maintain, and insure the residence.

. . . .

16.  In addition, the court finds defense counsel, William Buckley, to be in contempt of court for admittedly advising his client to violate the court's order not to remove any furniture, fixtures, appliances, or attachments from [the Residence] without first obtaining court authorization to do so. In making its finding, the court would note that Ms. Wilson was given more than (60) days to remove herself from the premises, thus, giving counsel plenty of time to seek court authorization concerning the items of personal property she claimed as her own. The court would also note that at the January 20, 2023, hearing counsel initially stated that the reason his client disobeyed the court's order was because, "I obviously didn't explain the order very well to her." Then at the January 26, 2023 hearing counsel announced that he was to blame for his client's violation of the order because he advised her to do so. Although the court is not finding Defendant, or defense counsel, in contempt of court for their failure to comply with the court's order to provide an accounting in this matter, it believes its failure mandate compliance with that order only emboldened them to believe that the orders of this court were merely advisory, as opposed to compulsory. For his contemptuous conduct William Buckley will be ordered to pay Plaintiff's counsel an attorney's fee of $1250.00 for the additional fees that were incurred by Plaintiffs in pursuant of the citation for contempt.

Wilson and Buckley filed a timely amended notice of appeal; this appeal followed.

## II. *Standards of Review*

This court reviews probate matters de novo but will not reverse findings of fact unless they are clearly erroneous. *McAdams v. McAdams,* 353 Ark. 494, 497, 109 S.W.3d 649, 651

(2003); *Morton v. Patterson*, 75 Ark. App. 62, 65, 54 S.W.3d 137, 139 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with the firm conviction that a mistake has been made. *Morton*, *supra*. This court must also defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. *McAdams*, *supra*. However, our appellate courts do not defer to the circuit court on questions of law. *Jones v. Abraham*, 67 Ark. App. 304, 310, 999 S.W.2d 698, 702 (1999).

Our standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *See Gatlin v. Gatlin*, 306 Ark. 146, 150, 811 S.W.2d 761, 764 (1991).

III. *Discussion*

A. Life Estate in the Residence

First, Wilson argues that the circuit court erred in finding that her life estate in the Residence was revocable and could be terminated. Specifically, Wilson contends (1) the circuit court's finding is clearly erroneous because appellees never asserted a cause of action seeking a declaratory judgment or other ruling from the circuit court regarding whether Wilson's life estate was revocable and subject to termination, and (2) the circuit court's ruling was clearly erroneous because the trust expressly stated that Wilson's life estate was irrevocable, and evidence at trial reflected Jeanette's intent for Wilson to retain her life estate without exception or revocation. In response, appellees maintain that Wilson's postdeath beneficiary status under the trust is subject to defeasance or divestment at any time during Jeanette's life. Regardless of the provisions of the trust, appellees argue that under the

10

Arkansas Trust Code, Arkansas Code Annotated sections 28-73-101 to –1013 (Repl. 2012 & Supp. 2023), Wilson—as trustee—breached her fiduciary duty by self-dealing; thus, the circuit court has the power to modify dispositive provisions of the trust and take necessary action in the interest of justice.

As a preliminary matter, it must be determined whether this court can reach the merits of Wilson's argument on appeal. For the reasons discussed below, we find that we cannot.

The circuit court entered its order on December 12, 2022, and Wilson's motion for new trial, motion to vacate, and motion to modify the court's final order was timely filed on December 22. The court held a hearing on Wilson's motion on January 20; however, the court did not enter its ruling on the motion until February 6, 2023. Thus, the amended order was entered after Wilson's motion to modify was deemed denied pursuant to Arkansas Rule of Appellate Procedure–Civil 4(b)(1) (2023). Rule 4(b)(1) provides:

> (b) *Extension of time for filing notice of appeal.*
>
> (1) Upon timely filing in the circuit court of a motion for judgment notwithstanding the verdict under Rule 50(b) of the Arkansas Rules of Civil Procedure, a motion to amend the court's findings of fact or to make additional findings under Rule 52(b), a motion for a new trial under Rule 59(a), or *any other motion to vacate, alter, or amend the judgment made no later than 10 days after entry of judgment,* the time for filing a notice of appeal shall be extended for all parties. The notice of appeal shall be filed within thirty (30) days from entry of the order disposing of the last motion outstanding. *However, if the circuit court neither grants nor denies the motion within thirty (30) days of its filing, the motion shall be deemed denied by operation of law as of the thirtieth day, and the notice of appeal shall be filed within thirty (30) days from that date.*

Emphasis added.) Our supreme court has held that a circuit court's failure to act within the thirty-day period under Rule 4(b)(1) results in the loss of jurisdiction in the circuit court to

11

grant relief under Rule 60(a) of the Arkansas Rules of Civil Procedure. *See Murchison v. Safeco Ins. Co. of Ill.*, 367 Ark. 166, 171, 238 S.W.3d 11, 14–15 (2006). Accordingly, because the circuit court lost jurisdiction to rule on Wilson's motion, the amended order entered on February 6, 2023, is void as it relates to Wilson's posttrial motion.

On February 24, Wilson filed an amended notice of appeal from the "collective final orders . . . entered in this matter respectfully on December 12, 2022 and February 6, 2023" in favor of appellees. In the original judgment, the circuit court held that Wilson had "an unvested contingent defeasible life estate" in the Residence as a result of the court's finding that the trust granted Jeanette the right to amend or revoke such at any time. The court further found that the January 2, 2020 warranty deed conveyed no interest to Wilson individually, but only as trustee, and terminated her right to possess and occupy the Residence "to [e]nsure the preservation of this substantial trust asset."

In response to Wilson's motion to modify the order, the circuit court entered the amended judgment wherein the court revised its findings and legal conclusions in support thereof. Pursuant to Arkansas Code Annotated section 28-73-602(a), the court determined that because there was no provision in the trust declaring it to be an irrevocable document, it was revocable; furthermore, the provisions of the trust gave Jeanette the right to use all trust assets, including the Residence, for her benefit during her lifetime. Accordingly, the court held "[t]his includes the right to sell the residence and use the proceeds for her maintenance and upkeep." The court reasoned that Jeanette's intention was not to give Wilson "any right in the property that would supersede or extinguish her own right to use the property for her benefit." Then, contrary to its previous finding—that Wilson had an

"unvested contingent defeasible life estate"—the court held that Wilson *had not* been granted a life estate in the Residence.

On appeal, Wilson seeks no relief from the December 12 order—only the February 6 amended order. Wilson's arguments are based solely on the court's findings in the amended order. In fact, Wilson reiterates several times—in both her brief and reply brief—that the errors in the circuit court's amended order are the subject of this appeal. For instance, Wilson explicitly states that "the trial court's February 6, 2023 Amended Order controls in determining the trial court's ultimate findings of fact for purposes of appellate review." Moreover, in her reply brief, Wilson scolds appellees for making an argument based on a legal conclusion the circuit court made it its original order—that the life estate interest was contingent on the death of Jeanette—stating that the court did not come to that conclusion in its amended order; thus "it is not an appropriate basis for the trial court's ruling to be affirmed."

Within her briefs, there are other various instances in which Wilson directs this court's review to the circuit court's amended order that, in Wilson's words, "replaced its previous findings." Thus, because Wilson's arguments on appeal are exclusive to the circuit court's findings in the amended order—which the circuit court was without jurisdiction to enter—we cannot reach the merits of this point on appeal. In order to do so, this court would have to disregard Wilson's arguments assigning error in the amended order and apply those same arguments to the original judgment, which differed in its reasoning and legal findings. However, it is a well-settled principle of appellate law that we do not make a party's arguments for him or her. *See Foster v. Est. of Collins*, 2017 Ark. App. 65, at 4, 511

S.W.3d 900, 903. Furthermore, this court cannot apply Wilson's arguments to an order that she persistently maintains is not the subject of her appeal. We find that the amended order is void—as it relates to this point on appeal—pursuant to Rule 4(b)(1), and because we cannot reach the merits of Wilson's arguments, we affirm the circuit court's December 12, 2022 order.

## B. Contempt of Court

Separate appellant Buckley argues that the circuit court erred in finding he was in contempt of court.[1] Specifically, Buckley maintains that the record does not reflect civil contempt or criminal contempt. We agree.

Appellees filed their motion for contempt against Wilson on January 19, 2023, for violating the circuit court's directive in the December 12 order not to remove "any furniture, fixture, appliances, or attachments without first obtaining court approval to do so." In a combined hearing held on January 20, 2023, the court heard arguments regarding both the citation for contempt and Wilson's motion for new trial and/or to vacate or modify the court's December 12 judgment. In the February 6 amended order, the court held Wilson in contempt, as well as Buckley, "for admittedly advising his client to violate the court's order not to remove any furniture, fixture, appliances, or attachments" from the Residence without first obtaining court authorization to do so. Accordingly, the court ordered Buckley to pay appellees' counsel attorney's fees of $1,250 "for the additional fees that were incurred by Plaintiffs in pursuant of the citation of contempt."

---

[1]Wilson did not appeal the circuit court's order finding her in contempt of court.

14

Disobedience of any valid judgment, order, or decree of a court having jurisdiction to enter it may constitute contempt, and punishment for such contempt is an inherent power of the court. *Balcom v. Crain*, 2016 Ark. App. 313, at 3, 496 S.W.3d 405, 407. Contempt is categorized into criminal contempt and civil contempt. *Shields v. Kimble*, 2016 Ark. App. 151, at 9, 486 S.W.3d 791, 797. In *Omni Holding and Development Corp. v. 3D.S.A., Inc.*, our supreme court distinguished civil and criminal contempt as follows:

> Contempt is divided into criminal contempt and civil contempt. Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. Civil contempt, on the other hand, protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. This court has often noted that the line between civil and criminal contempt may blur at times. Our Court of Appeals has given a concise description of the difference between civil and criminal contempt. *See Baggett v. State,* 15 Ark. App. 113, 116, 690 S.W.2d 362, 364 (1985) ("[C]riminal contempt *punishes* while civil contempt *coerces*." (emphasis in original)).

> In determining whether a particular action by a judge constitutes criminal or civil contempt, the focus is on the character of relief rather than the nature of the proceeding. Because civil contempt is designed to coerce compliance with the court's order, the civil contemnor may free himself or herself by complying with the order. This is the source of the familiar saying that civil contemnors "carry the keys of their prison in their own pockets." Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged.

356 Ark. 440, 448–49, 156 S.W.3d 228, 234–35 (2004) (internal citations omitted). In *Arkansas Department of Human Services v. Jones*, this court held that an order holding the appellant in contempt and ordering it to pay $1,000 in attorney's fees to the appellee was "based on civil contempt because it was not payable to the court, but instead, to Jones's attorney." 2017 Ark. App. 365, at 5, 522 S.W.3d 853, 856.

Here, because Buckley was ordered to pay appellees—and not the court—we know that if there was any contempt at all, it was civil contempt. Buckley was ordered to pay an

unconditional fee for his disobedience of the court's order by 5:00 p.m. on February 20, 2023. However, the fee was not contingent on certain terms being satisfied; therefore, there is no valid civil contempt finding because the court did not "empower [Buckley] with a path to purge the contempt." *See Applegate v. Applegate*, 101 Ark. App. 289, 294, 275 S.W.3d 682, 686 (2008). In sum, the record demonstrates neither civil contempt nor criminal contempt.

Accordingly, we must conclude that a finding of contempt is clearly against the preponderance of the evidence. As such, we reverse the circuit court's order of contempt against Buckley and the award of attorney's fees associated with it.

IV. *Conclusion*

For the above-stated reasons, we affirm the circuit court's order entered on December 12, 2022, as to Wilson's argument on appeal, and we reverse the circuit court's contempt finding against Buckley.

Affirmed in part; reversed in part.

ABRAMSON, GRUBER, THYER, and MURPHY, JJ., agree.

HARRISON, C.J., and BARRETT, HIXSON, and BROWN, JJ., concur in part and dissent in part.

**BRANDON J. HARRISON, Chief Judge, concurring in part and dissenting in part**. I agree we should reverse the February 6 contempt finding as to appellant William A. Buckley III and join the majority's opinion on that point, to which I'll add a bit more at the end. But I dissent from the majority's decision to invent, apply, and saddle us hereafter with a new merit-avoidance analysis. The factual and legal merit supporting a reversal of

the circuit court's trust-related decision is compelling. We should address the merit issue Stephanie Wilson appealed and reverse the judgment. I begin with why we should reach the merits.

I.

A.

The majority refuses to address Stephanie's argument that her life estate was irrevocable—effectively, her whole appeal—because of "various instances in which she directs this court's review to the circuit court's amended order that, in [her] words, 'replaced its previous findings'" and because her arguments are "are exclusive to the circuit court's findings in the amended order—which the circuit court was without jurisdiction to enter." In other words, because Stephanie mistakenly concluded (as the circuit court had) that the court could amend the December order on February 6, the majority will not address her argument about a reversible error *both* orders share. Such a rule does not, and should not, exist; and if it did, we should not apply it here. Doing so sanctions a miscarriage of justice.

Here is the conclusion of Stephanie's opening brief:

> Based on the foregoing argument and authority, the trial court clearly erred in reaching an unpled judgment that Appellant Wilson's life estate was revocable and that she had no present interest in a home she jointly purchased and resided in for almost twenty years when the Trust and January 2, 2020 Warranty Deed expressly stated that Appellant Wilson had a present life estate that was irrevocable. Furthermore, evidence at trial reflected the settlor's intent that Appellant Wilson retain her life estate without revocation. Therefore, the trial court's judgment that Appellant Wilson's life estate was revocable and could be terminated by Appellees, thus forcing her out of her own home, should be reversed [as] clear error.

That's a nice summary of the entire case as it unfolded in circuit court. And all these words apply to the December order, which the circuit court reengineered in February to reach the

17

same result on what we presume the court thought would be firmer grounds. Stephanie should not suffer from the circuit court's jurisdictional misunderstanding.

The December order relied on a statute under which only "the court supervising [Jeanette's] guardianship"—that court being *in Virginia not Arkansas*—could grant the relief it had given Tad Kolterman, who was appointed Jeannette's guardian there after these proceedings began. Ark. Code Ann. § 28-73-602(f) (Repl. 2012). The circuit court noted the *wrong-court* point in section 602(f) and abandoned that statute (and that error) in the February order. But the revocability-of-the-life-estate error it renewed and re-expressed in the February order existed in the December order too.

The December order, identified in two notices of appeal, found Stephanie's life estate was unvested and defeasible because "[Jeanette] Kolterman, or in this case her guardian, has the right to amend or revoke her Living Trust at any time, which means any right that [she] may have in said property pursuant to the trust is subject to termination at the will of [Jeanette] or her guardian." Jeanette reserved a right to revoke *most* of the trust's provisions. But not Stephanie's life estate. I repeat, not Stephanie's life estate. And section 602(f), which the court thought gave it the power to terminate the life estate on a guardian's request, limits the guardian to exercising the "*settlor's powers* with respect to revocation." Ark. Code Ann. § 28-73-602(f) (emphasis added). But Jeanette's guardian (her Virginia Beach-based son) had no power to revoke Stephanie's life estate. Why not? Because, again, Jeanette had abandoned it, expressly and unambiguously.

18

And repeatedly. In binding legal documents. Whether Jeanette's children or the circuit court liked it or not, she expressed in the trust instrument that the life estate in Stephanie's favor was irrevocable. Read for yourself:

> 6.5    Settlor reserves the right at any time or times to amend, alter, or revoke this trust in whole or in part, or any provisions thereof, by an instrument in writing signed by Settlor and delivered to the Trustee during the lifetime of Settlor ==except Settlor does not retain the authority to revoke the provisions leaving a life estate in the property to Stephanie L. Wilson in the real property located at 7719 Camelot Circle, Fort Smith, AR 72903.==

(Highlighting mine.) If that weren't enough, there's more. Jeanette and Stephanie—who had owned the home as tenants in common—included a boldface reference to the life estate and its irrevocability in their deed to Jeanette's trust:

> **There is a provision in the Living Trust that allows Stephanie L. Wilson to remain in the house as long as she is able to do so and is irrevocable.**

The expression that Stephanie's life estate was irrevocable is both simply and redundantly made, belt-and-suspenders one might say, in Stephanie's favor. And it puts the majority's preservation decision in this light: no issue is simple enough, no error clear enough, no area of the law important enough, and no injustice plain enough that this court will not blind itself and affirm.

Does the majority opinion cite a controlling case that *requires* its jurisdiction/ preservation holding? No. Did the appellees raise a December order versus February order preservation point against Stephanie? No.

In any event, the December and February orders both depended on that life-estate-related error. And this core point is the majority's main preservation error. The life-estate-

revocability *issue* is what Stephanie has appealed and what both parties have briefed, below and on appeal. Regrettably, the majority opinion provides more fodder for another law-review footnote. *See* Brian G. Brooks, *Egads! Preservation Run Amok: A Call for Change to Arkansas's Was it Raised?, Was it Developed?, Was it Ruled On? Jurisprudence*, 37 U. Ark. Little Rock L. Rev. 267 (Winter 2015). Courts exist to meet disputes head on whenever possible. Yet this court has failed Stephanie Wilson and Jeanette Kolterman today because the latter's unequivocal wish that Stephanie enjoy the Fort Smith home has been dishonored by her children and, as of today, two separate courts, for separate but equally mistaken reasons.

If the majority finds silent support in *Murchison v. Safeco Insurance Co. of Illinois*, 367 Ark. 166, 238 S.W.3d 11 (2006), it is mistaken. In *Murchison*, our supreme court dismissed a timely appeal from the last of several postjudgment orders because the circuit court had lost jurisdiction when a postjudgment motion was deemed denied. *Id*. at 171, 238 S.W.3d at 15. Because the "time for filing a notice of appeal from the [original judgment] ha[d] long expired[,]" the court "lack[ed] jurisdiction to hear the appeal." *Id*. But Stephanie filed a timely notice of appeal from the December order, so we do have jurisdiction to hear this appeal.

Or at least, we did. I have understood that our jurisdiction is determined by what the parties did in the record below, not solely on what the parties say in their briefs here. Our rules require parties to file a timely notice of appeal *in circuit court*. Ark. R. App. P.–Civ. 3(b). They must "designate the judgment, decree, order or part thereof appealed from" *in circuit court*. Ark. R. App. P.–Civ. 3(e)(ii). Stephanie did all this. She listed both the December and February orders in a notice of appeal that was timely for both.

20

If her briefs deprived us of jurisdiction later, when did we lose it? If this is a briefing deficiency, and not jurisdictional, why can't she cure it in a substituted brief as we allow appellants who violate *existing* briefing rules to do? More to the point, given that this whole case (and the appeal) has been primarily about Stephanie's legal right to live in the Fort Smith home, can the principal brief be fairly read to advance that argument? Of course it can, and it should be. Fundamental notions of Justice and Public Service so demand.

All we need is common sense. Both orders leave Stephanie essentially homeless, subject to the continued kindness of an unnamed person who has "graciously donated a room to her."[1] There is no doubt or confusion about what she wants us to do: reverse the *judgment* for the circuit court's *error* of finding her life estate was revocable. If we were uncertain whether she wants to appeal that error in the December 12 order (the February 6 order being void except on the contempt issue) we should ask her, not toss her appeal. We in fact know what her answer is right now.

B.

We reached the point long ago where our accumulating finality and preservation rules began adding more labor in this process than they save, leading to more frustration and expense. And less justice, as this case shows. Stephanie incorrectly concluded—as the circuit court also had—that the findings in the February 6 order were controlling on her issue, but that shouldn't matter here. Both orders she appealed share the error she briefed. Stephanie

---

[1]Stephanie's counsel told the circuit court this: "I think that from the beginning she thought that she had a place to stay and reside for the remainder of her life. Then, the next thing she knows, she has her home taken away from her, she has all her property taken away from her. And now at this point all she has is a room to stay in that someone has graciously donated to her."

acknowledged doubt on the controlling-order point, and it was inevitable that her briefs would also discuss the February 6 order, because it controlled Buckley's related contempt appeal, which we reverse today 9–0.

The majority suggests Stephanie "explicitly states that 'the trial court's February 6, 2023 Amended Order controls in determining the trial court's ultimate findings of fact for purposes of appellate review.'" The full sentence, which follows a discussion of Rule 59, reads, "*Therefore, Appellant submits* that the trial court's February 6, 2023 Amended Order controls in determining the trial court's ultimate findings of fact for purposes of appellate review." (Emphasis added.) To "submit" that under a stated analysis one order is controlling conveys the party's acknowledgement that this might be wrong. Which order controls came down to jurisdiction, so we would reach our own conclusion whether Stephanie had guessed right, guessed wrong, or declined to guess either way.

Further, the jurisdictional issue was not as simple for her as for most parties who foul on the deemed-denied rule, because the circuit court had jurisdiction to enter a different part of the February 6 order that was also on appeal—namely, the contempt finding against Buckley. But the majority provides no quarter to Stephanie Wilson as it fired its jurisdiction-and-preservation buckshot into the heart of her appeal. Without warning, and without an adequate citation.

And recall this from Stephanie's principal brief that I excerpted earlier: Jeanette's children *had not* asked for the relief they received. It came in gift form because the circuit court raised the issue after trial. The court then decided the issue erroneously, twice, to defeat and wholly invert Jeanette's express "primary purpose" for settling the trust, which

22

was "to maintain the house located at 7719 Camelot Circle, Fort Smith, AR 72903, as long as both the Settlor and Stephanie L. Wilson can possibly live there independently and/or with the assistance of each other or hiring help so that they can stay in their home and provide funds for those expenses." The court interpreted that trust so that *neither* woman could live there, starting immediately: Stephanie is practically homeless; Jeanette is in a nursing home far away. No wonder Stephanie and Jeanette's estate-planning lawyer was so distraught that she paid Buckley out of her own pocket, so she could withdraw and be a witness to support Stephanie's case against Jeanette's children. Stephanie and Jeanette had owned the Camelot Circle home in common for seventeen years, then placed it in a trust they believed would "preserve finances for [them] to live out the rest of [their] days on Camelot Circle." This case has always been about this fact, after the circuit court raised the issue on its own initiative. No one has been surprised or caught unaware on appeal. Consequently, I would reach the merits of the case.

## II.

Moving on from the jurisdiction/preservation point, more needs to be said about why the December judgment should be reversed. Under the substantive law and our rules for interpreting a trust, the revocability issue could only go Stephanie's way. Jeanette *could* include an irrevocable provision in an otherwise revocable trust. Under Arkansas law, a settlor of a trust may reserve the right to revoke a trust "in whole or in part." *Aycock Pontiac, Inc. v. Aycock*, 335 Ark. 456, 983 S.W.2d 915 (1998). That is also the Restatement view. *See* Restatement (Second) of Trusts § 331(1) (1959) ("The settlor has power to modify the trust if *and to the extent that* by the terms of the trust he reserved such a power.") (Emphasis

23

added.); Restatement (Third) of Trusts § 63(1) (2003) ("The settlor of an inter vivos trust has power to revoke or modify the trust *to the extent* the terms of the trust (§ 4) so provide.") (Emphasis added.); *see also* Restatement (Third) of Trusts § 63 cmt. e:

> *e. Partial revocation.* The settlor may reserve a power "to revoke the trust as to all or any part" of the property, or a power to revoke only as to a stated portion of the trust property . . . .

And make no mistake, Jeanette's trust *did* make the life estate irrevocable. Her intent is clear enough in the trust instrument that we could say so from its four corners.[2] The most important paragraphs, though introduced by language that assumes Jeanette has died, are these:

> (i) Stephanie L. Wilson is the beneficiary of all of the assets of this Trust as long as she is alive to use the funds in order that she be able to live in [the house]. Settlor specifically provides she has a life estate in [the house] owned by the Trust as long as she is able to live there and if she goes to a nursing home and is not able to return after (2) years, then the Trustee if, at her discretion, believes Stephanie L. Wilson will never be able to return to living at the home, then the Trustee can deed the house on [to the residual beneficiaries, the appellees.] The provision of the life estate to Stephanie L. Wilson in [the house] is irrevocable because she voluntarily gifted her joint [interest] to this Trust (subject to her going to a nursing home as provided herein).

> (ii) The primary purpose of this Trust is to maintain [the house] as long as both the Settlor and Stephanie L. Wilson can possibly live there independently and/or with the assistance of each other or hiring help so that they can stay in their home and provide funds for those expenses.

Our duty is to make an honest assessment of Jeanette's intent. For example, did Jeanette intend to give Stephanie an immediate right to enjoy their home, or only after her death? I conclude she conveyed an immediate right, though the trust instrument is silent.

---

[2]For the sake of argument, if one found the trust ambiguous on this point, the evidentiary record easily clarified and established that the trust gave Stephanie an irrevocable life estate in the ladies' home.

Stephanie's right to enjoy the home is not a true life estate because it could end *before* her death: Stephanie can live in the home "as long as she is able to live there[,]" but the successor trustee can deed it to Jeanette's children, the residual beneficiaries, "if she goes to a nursing home and is not able to return after (2) years." The need for that future determination—which I note, so the equities are clear, was to benefit *Jeanette's children* with an earlier gift—explains why the women would not simply have reserved a life estate when they deeded their home to the trust if they intended to remain in possession. The recital in paragraph (i) that Stephanie had contributed an interest in the home shows she had a right to live there when the trust was created. No one disputes the trust would give her that right after Jeanette's death. Why would Stephanie give it up, or Jeanette take it away, in the meantime?

The notion conflicts with virtually every word in the statement of "primary purpose" that follows: "The primary purpose of this Trust is to maintain [the house] as long as both the Settlor and Stephanie L. Wilson can possibly live there independently and/or with the assistance of each other or hiring help so that they can stay in their home and provide funds for those expenses." After Jeanette's death, (1) it would be impossible for "both the Settlor" and Stephanie to live in the home; (2) there could be no "assistance of each other"; and (3) neither Stephanie nor anyone else could be of earthly benefit to Jeanette.[3] The trust

---

[3]Brass tacks: the point was to allow two elderly women to stay in their home *instead of a nursing home* as long as possible, perhaps in a spoiled attempt to protect the residual gift of their home *to Jeanette's children* from Medicaid liens. *See Peek v. Diley*, 2023 Ark. App. 576, at 3.

instrument repeatedly expresses that Stephanie's life estate is irrevocable, including in paragraph 6.5, which I included in the introduction.

Jeanette's children are permitted to walk away (for now) with this in their wake: Stephanie, a decades-old close friend to Jeanette and a retired schoolteacher who is seventy-three or so years old, is left more or less homeless by an attempt to leave her only major asset *to them*. She has lost all her money because Jeanette's children withdrew it from Jeanette's and Stephanie's *joint* bank accounts using guardianship orders. But Jeanette did not choose either of them to be guardian; she chose Stephanie. The trust instrument designates Kim Ballard, another longtime friend and professional colleague, to serve as trustee if Stephanie could not serve. The circuit court ignored that provision, too. Tad, whom it appointed after removing Stephanie as trustee, was not Jeanette's first choice, or even second choice, to hold a fiduciary position of any kind. A rather alarming breach of the settlor's intent when you add it all up, don't you think?

What Jeanette and Stephanie lacked was clairvoyance. Before these proceedings began, they made two key "mistakes":

1.   Having lived with Stephanie for thirty-eight years, and planned to continue that until death or medical need parted them, Jeanette did not unambiguously provide that Stephanie (or Jeanette herself, for that matter) could live in their home while Jeanette was alive.

2.   In January 2021, Stephanie was hospitalized with COVID-19.

While Stephanie was in the hospital, Jeanette's daughter Monica snooped through their mail. She realized her mother, who had never earned much teaching at a private elementary school, had a trust—and some money. Though Monica was not Jeanette's first or second choice to be guardian, she procured a temporary emergency guardianship order in Sebastian

26

County and used it to withdraw all of Jeanette and Stephanie's money from their joint accounts. Tad, her brother, took Jeanette to Virginia Beach. They acknowledged at trial that a different Sebastian County Circuit Court judge had ordered Monica to return Jeanette to Fort Smith, but they had not done it. And the presiding circuit judge in this case did not inquire further.

Despite having sole access to Jeanette for more than a year, the only evidence of her wishes the appellees offered at trial was a secretly recorded phone call in which Jeanette told Stephanie she would stay in Virginia Beach—and told Stephanie to keep all the trust money or half of it, as she chose, and that Jeanette might come back "once in a blue moon," presumably to the house that the trust charged Stephanie to maintain.[4]

By the way, most of the breach–of–fiduciary–duty allegations against Stephanie were specious, and based on spending consistent with maintaining the household, which was the express purpose of the trust. Jeanette could consent to that spending, in any event, because the settlor of a *revocable* trust can ignore formalities in its terms: "To the extent a trust is revocable by a settlor, a trustee may follow a direction of the settlor that is contrary to the terms of the trust[.]" Ark. Code Ann. § 28-73-603(a) (Supp. 2023). Further, while a trust is revocable and the settlor retains capacity, "rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor." *Id*. § 28-73-603(b). That means to Jeanette, not her children. The breach–of–fiduciary–duty theory

---

[4]Jeanette said she was "very very very happy" in Virginia Beach—at Tad's house— amid arguably contradictory statements during the same call. She's not at Tad's house now. Less than two weeks after he was awarded guardianship in Virginia at a hearing Jeanette did not attend, she was in a nursing home. Her children won't tell Stephanie where she is.

they employed to undo Jeanette's wishes, which might aptly be called the "trustee from a second marriage" theory of breach (despite some factual differences here), should concern the estate-planning community.

The record is abundantly clear that maintaining the household for both women was the "primary purpose" of the trust. What made it impossible for Jeanette to return there? Her decision to stay in Virginia was itself a change of mind—and not even a change of mind in writing. What was Stephanie, who had accepted a trust that *was* in writing, to do? She did not need permission to spend on home improvements; the instrument expressly permits the trustee to "improve any real estate comprised in the Trust estate . . . on such terms as it thinks fit." Even paying her modest life insurance premiums with trust money was arguably consistent with permission to invest the trust assets. Why? Because Jeanette was the beneficiary of that life-insurance policy. Pause and let that sink in.

The substance of section 28-73-602(f), which the December order invokes to grant Jeanette's guardian the power to meddle with the trust, doesn't matter in the appeal because the revocability error alone would be enough to reverse. I note, however, that section 602(f) should be used circumspectly and only for better reasons than in this case. The drafters of the Trust Code comment that "[b]ecause a settlor often creates a revocable trust for the very purpose of avoiding [guardianship or] conservatorship, this power should be exercised by the court reluctantly."[5] Ark. Code Ann. § 28-73-602 editor's notes, unif. law

---

[5]Jeanette had covered that base, at least in Arkansas ballfields, by also nominating Stephanie as her guardian. *See* Ark. Code Ann. § 28-68-108(a) (Repl. 2012) ("Except for good cause shown or disqualification, the court shall make its appointment in accordance with the principal's most recent nomination.").

cmt. (West current through acts effective July 21, 2024). Under the Trust Code, the settlor's intent is the polestar in the exercise of virtually any discretion the courts are given. *See* Ark. Code Ann. §§ 28-73-106 (Repl. 2012) ("The common law of trusts and principles of equity supplement this chapter[.]"); -412(a) (allowing modification of trust "in accordance with the settlor's probable intention" if, in unanticipated circumstances it will "further the purposes of the trust.") & (c) (trustee must distribute the property on termination "in a manner consistent with the purposes of the trust."); -414(c) (same upon termination of an uneconomic trust).

Although the circuit court had no power to reach Stephanie's irrevocable life estate in any event, I hope it does not need to be said that these statutes are not intended to give trust beneficiaries (or heirs who wish they were beneficiaries) an end-run around settlors' free and voluntary decisions about how to dispose of their own property. The Koltermans made no suggestion that Jeanette executed the trust under undue influence or while she lacked capacity. It appears they simply disapproved of how she had lived for thirty-eight years.

As to Stephanie Wilson's appeal, I respectfully dissent from the majority's decision to blink at the merits. I would reach them and reverse the circuit court's judgment because the court clearly erred as a matter of fact and law.

### III.

On Buckley's appeal of the contempt order entered against him, I join the majority's analysis and disposition. I write to add a bit of additional context, which is that Buckley was held in contempt because he told Stephanie that she could take her own bed out of the

29

Camelot Circle home, around Christmastime, ahead of the court's deadline to vacate the home. During a January 2023 hearing on whether to jail Stephanie for contempt, Buckley asked the court not to jail her for taking the bed because she had asked him by phone whether she could do so. He advised her that she could take it if it belonged to her. The circuit court took offense with what strikes me as rather reasonable advice from counsel, who only told a then-penniless elderly woman that she could take her own bed from her home of nearly two decades so that she could place it elsewhere during the holiday season.

I agree with the technical reasons the majority has well expressed for its reversal. Technicalities aside, the circuit court also abused its discretion, in my view, when it held counsel in contempt for showing some compassion and empathy to a dispossessed, elderly woman and client who wanted what was indisputably her own bed to sleep on, wherever its new destination was to be. The transcript also seems to reveal that Jeanette's children took property from the home and to Virginia before it was "divvied up" by the court, and neither the children nor their counsel faced contempt. Perhaps Buckley assumed that no court would refuse Stephanie's request, if asked, and *this* court would not wish to be bothered with it over the holidays. Not for the first time, Stephanie had her choice of bad options. Having reviewed the entire record, I agree that the circuit court erred when it held William A. Buckley III in contempt and agree to reverse that decision.

BARRETT, HIXSON, and BROWN, JJ., join this opinion.

**KENNETH S. HIXSON, Judge, dissenting in part**. I agree wholeheartedly with Chief Judge Harrison's opinion. On the issue of preservation, the dissent concludes: "*As to Stephanie Wilson's appeal, I respectfully dissent from the majority's decision to blink at the*

*merits.*" In this context, "blink" is a woeful understatement. "Eyes wide shut" would be more appropriate.

Further, I take issue with the majority's conclusion that this court will not make a party's (Stephanie Wilson's) argument for him or her. Specifically, the majority opinion concludes:

> *However, it is a well-settled principle of appellate law that we do not make a party's arguments for him or her. See Foster v. Estate of Collins, 2017 Ark. App. 65, at 4, 511 S.W.3d 900, 903. Furthermore, this court cannot apply Wilson's arguments to an order that she persistently maintains is not the subject of her appeal. We find that the amended order is void—as it relates to this point on appeal—pursuant to Rule 4(b)(1) and because we cannot reach the merits of Wilson's arguments, we affirm the circuit court's December 12, 2022 order.*

Hold on. . . . Who made a party's argument for whom? Without any input or assistance from the appellees, this court's majority sua sponte conceived, birthed, and reared the argument that benefited appellees to such an extent they dismissed Wilson's appeal. Who conceived the void-judgment/jurisdiction issue? The majority. Who researched the issue? The majority. Who made the argument for them? The majority. It was not the appellees. I would be so bold as to prognosticate that the appellees will be the second-most surprised parties by the majority opinion dismissing the appeal. It is disingenuous at best to hold that this court will not make Stephanie Wilson's argument for her and, in the next breath, create, research, and write the appellees' argument out of whole cloth and dismiss the appeal.

This problem started when, for some untold reason, the circuit judge held a hearing on a posttrial motion that had already been deemed denied by operation of law. Then, to compound the problem, the circuit judge issued an order emanating from that untimely hearing that was void ab initio due to the application of the deemed-denied rule. Fortunately, Wilson filed notices of appeal from *both* the original December 12 order *and*

31

the void February 6 order. Her arguments are the same as to either order as set forth in Chief Judge Harrison's dissent. Both Stephanie Wilson and Jeannie Kolterman deserve better. They, at least, deserve to have this case decided on the merits.

Finally, I would add that the majority's ultimate disposition, "[*W*]*e affirm the circuit court's December 12, 2022 order*[,]" is incongruous. The majority chose to not review the circuit court's order of December 12, and I cannot understand how the majority affirmed an order they decided not to review.

I disagree with the majority's determination that Wilson's appeal should be dismissed, and I would reverse the circuit court's order on the merits.

*The Buckley Firm*, by: *Ashleigh R. Buckley*, for appellants.

*Skinner Law Firm, P.A.*, by: *Jack Skinner*, for appellees.